# IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND

| | |
|---|---|
| JANE CHASE<br>2040 General's Highway<br>Annapolis, Maryland 21401 | *<br><br>* |
| Plaintiff, | * |
| v. | * |
| THE NASTOS GROUP, INC.<br>7710 Marwood Drive<br>Clinton, Maryland 20735<br>Serve on:<br>Julia Martell<br>Resident Agent<br>7710 Marwood Drive<br>Clinton, Maryland 20735 | *<br><br>*<br><br>*<br><br>*<br><br>* |
| WILLIAM H. MILLER<br>13701 Santa Rosa Court<br>Manassas, Virginia 20112-3819 | *<br><br>* |
| and | * |
| VIRGINIA HOMESAVERS, INC.<br>Serve on:<br>R. Dare Clifton<br>2124 Jefferson Davis Highway<br>Suite 301<br>Stafford, Virginia 22554 | *<br><br>*<br><br>* |
| Defendants. | *   CASE NO. _C -07- 120982_ |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Jane Chase ("Ms. Chase"), through her attorneys, files this Complaint and

states:

## INTRODUCTION

1.      This case involves a "Foreclosure Rescue Scam," in which the Defendants fraudulently tricked and induced the Plaintiff into transferring title of her home to Defendant The Nastos Group, Inc. ("The Nastos Group"), under the guise of a refinancing to help save her home arranged by Defendants William H. Miller ("Mr. Miller") and Virginia Homesavers, Inc. ("Virginia Homesavers"). After The Nastos Group obtained title to the home for a fraction of its value, and after Mr. Miller and Virginia Homesavers had taken tens of thousands of dollars in Ms. Chase's money for unlawful and exorbitant fees, The Nastos Group forced Ms. Chase out of her home in landlord tenant proceedings and took possession of the property.

2.      The actions of the Defendants violated statutory law and constituted common law fraud. Defendants Virginia Homesavers and Mr. Miller acted as credit repair organizations, offering to help repair Ms. Chase's credit and save her home by arranging a creative mortgage refinancing to stop an impending foreclosure – but these Defendants failed to give Ms. Chase essential and required federal disclosures, defrauded her into believing that she was engaging in a refinancing that would help her, and unlawfully took more than 8% of the loan amount as their fees. Defendants The Nastos Group extended what constituted an equitable mortgage at unconscionable terms to Ms. Chase, at terms they knew she could not meet, and without the disclosures required by law to protect consumers such as Ms. Chase – and The Nastos Group defrauded Ms. Chase into believing that the loan was to help save her home. All of these Defendants conspired to commit these unlawful acts, and aided and abetted each other in their commission. As a result, Ms. Chase lost her home, lost the equity in their home, and has suffered

extreme mental anguish and emotional distress.  The Defendants have benefited by obtaining her

home at a fraction of its value and taking exorbitant fees from money that was rightly Ms.

Chase's.  Ms. Chase seeks relief from the unlawful and immoral acts of the Defendants, and

requests statutory, compensatory, and punitive damages to make her whole through this lawsuit.

## PARTIES

3.     Plaintiff, Jane Chase, is a natural person residing in Anne Arundel County Maryland.

4.     Defendant The Nastos Group is a Maryland corporation doing business in Anne Arundel

County.

5.     Defendant Virginia Homesavers, Inc. is a Virginia corporation with its principal place of

business in Virginia, doing business in Maryland.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under Md. Cts. & Jud. Pro. §6-102 and §6-

103 because Defendant The Nastos Group is domiciled in Maryland and all the Defendants

derive substantial revenue from real estate, mortgage and other services regarding property in

Anne Arundel County, Maryland.

7.     Venue is proper in this Court under Md. Cts. & Jud. Pro. §6-201 because all of the

Defendants conduct regular business in Anne Arundel County, Maryland, and the actions giving

rise to this suit were taken concerning property in Anne Arundel County, Maryland.

## FACTS

8.     Ms. Chase lived at 1216 Heartwood Court, in Arnold, Maryland ("the Property") until

Defendant The Nastos Group took title to her home, doubled her monthly house payment, and

-3-

then forced her out of the home through landlord-tenant eviction proceedings.

9.      Ms. Chase purchased the Property in 1999, for a price of $90,708.00, with help from a

first-time buyer program with Arundel Community Development Service, Inc.

10.     Ms. Chase's monthly mortgage payment on the Property was $828.41.

11.     Ms. Chase encountered some hardships, and fell behind in her mortgage payments.

Foreclosure proceedings were initiated in early 2005, and soon thereafter Ms. Chase received a

number of letters from people and companies ostensibly offering to help "save her home" from

foreclosure. Ms. Chase responded to one of these solicitations, feeling it was her only option to

save the Property, and reached Ron Balkissoon ("Mr. Balkissoon").

12.     During the phone conversation, Mr. Balkissoon told Ms. Chase that he could save her

home from foreclosure with no expense to her. He arranged a meeting with Ms. Chase, in a

parking lot in Anne Arundel County.

13.     Mr. Balkissoon then visited Ms. Chase's home. He brought about some other people

with him who Ms. Chase did not know to walk through the Property.

14.     The next time Ms. Chase met Mr. Balkissoon was in the parking lot of Landover Mall, in

Prince George's county. At that meeting, Mr. Balkissoon told Ms. Chase to sign a number of

documents, including a loan application.

15.     After this second meeting, Mr. Balkissoon called Ms. Chase and told her he had found

someone to help save her home – William H. Miller ("Mr. Miller"), a realtor in Virginia. Mr.

Balkissoon told her to come to Mr. Miller's office in Minnieville, Virginia.

16.     Ms. Chase went to Mr. Miller's office, and met with Mr. Miller. He told Ms. Chase that

-4-

he saved homes as a business.  Mr. Miller pulled Ms. Chase's credit report – he told her that her credit was bad, but that he would try to work things so that she could pay off some of the liens on her home.  Mr. Miller had Ms. Chase sign a number of documents at this meeting.

17.     After Ms. Chase had signed the documents which Mr. Miller presented her, Mr. Miller told her that he was going to fix her credit so that she could do what she needed to do in life.  He told her that he could save her home, or that she could sell it, stay in it, and then buy it back.

18.     Ms. Chase told Mr. Miller that she did not want to sell her home.  She told Mr. Miller that what she was interested in doing was refinancing the Property.

19.     After meeting Mr. Miller in his office, Ms. Chase called to speak with him and to see how her transaction was going.  Mr. Miller told her that her credit was clearing, that he was paying off her creditors, and that she was going to settlement and would receive cash at the settlement table.

20.     The settlement on the Property occurred on May 9, 2005, at the offices of Security American Settlements ("SAS"), in Fairfax, Virginia.  Ms. Chase believed when she walked into the settlement offices that she was refinancing, and when she talked with Mr. Miller at the settlement, he told her she was refinancing.

21.     At the settlement, Mr. Miller introduced Ms. Chase to Manuel Santos ("Mr. Santos") and Jose Taboada ("Mr. Taboada").  Mr. Miller told her that the men would be taking care of her home, and that Mr. Taboada would be her gardener.  In fact, Mr. Santos and Mr. Taboada were co-owners of The Nastos Group, Inc. ("The Nastos Group"), the company that was going to purchase her home at the settlement unbeknownst to her.

22.     During the settlement, Ms. Chase signed a number of documents.  She was rushed

-5-

through the process by the Defendants, did not read the documents, and the documents were not explained to her. She did not understand that among the documents she signed were documents for the sale of her home to The Nastos Group.

23.     Ms. Chase also signed several checks. She was told to sign checks for Mr. Miller, The Nastos Group, and the title company. She was not given any check or money for herself.

24.     Once the settlement was complete, Ms. Chase asked why she was the only one who did not receive a check, when she had been told she would receive money from the settlement. Mr. Miller asked her how much money she needed right then. She said she needed $500.00, and Mr. Miller gave her a $500.00 check – then, Mr. Miller sent her a letter demanding that she pay him back the $500.00, the solitary, paltry sum she received from the settlement that ultimately resulted in the loss of her home.

25.     Settlement documents show that the amount paid on behalf of Ms. Chase - to pay off her first and second mortgages, and to pay off liens on the Property – totaled $148, 475.00. This is the only consideration that was received by Ms. Chase from this transaction.

26.     Mr. Miller received more than $35,000.00 in cash from the transaction. All of this cash was paid from money that was Ms. Chase's.

27.     After the settlement was complete, after the Defendants all received large checks, and when she was presented with a lease to sign, Ms. Chase realized she had signed her home over to The Nastos Group during the settlement. She signed the lease she was presented because she feared she would lose not only title to the Property but also the possession of her home if she did not sign the lease. Mr. Miller told her that one of the checks she signed, to The Nastos Group,

was in case she fell behind in her lease payments. This check, a security deposit on the lease Ms. Chase signed, was in the amount of $5,797.13. When The Nastos Group later successfully sued to evict her from her home, The Nastos Group gave her no credit for the thousands of dollars it took from her at closing for this ostensible security deposit.

28.     The lease Ms. Chase signed called for monthly payments of $1,500.00 – nearly twice the amount of Ms. Chase's previous monthly mortgage payments. The Defendants all knew Ms. Chase could not make these payments on a continuing basis. However, even given the exorbitant level of monthly payments, The Nastos Group took well over two times the amount of these monthly payments as an illegal security deposit, as described above.

29.     Ms. Chase made several monthly payments to The Nastos Group, but then fell behind.

30.     The Nastos Group filed complaints to repossess the Property against Ms. Chase on December 21, 2005, December 29, 2005, January 6, 2006, January 27, 2006, and February 3, 2006.

31.     Notices were posted on the Property stating that Ms. Chase would be evicted from the Property on March 28, 2006, at which time her belongings would be placed on the public street. Ms. Chase vacated the Property due to the posting of these notices, and The Nastos Group took possession of it.

32.     The Nastos Group subsequently sold the Property for $295,000.00, when it purchased the property from Ms. Chase for consideration of only $148,475.00 – realizing a nearly 100% profit of $146,525.00 after 20 months.

## COUNT ONE

-7-

## DECLARATORY JUDGMENT

33.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

34.     The property transaction in which Ms. Chase purportedly transferred the Property to The

Nastos Group actually constituted a mortgage transaction.

35.     Ms. Chase and The Nastos Group have or claim interests under a "special warranty deed."

36.     The "special warranty deed" constitutes a mortgage under Md. Code Ann., Real Prop.§7-

101(a).  The statute states:

> Every deed which by any other writing appears to have been intended only as
> security for payment of an indebtedness or performance of an obligation, though
> expressed as an absolute grant is considered a mortgage. The person for whose
> benefit the deed is made may not have any benefit or advantage from the
> recording of the deed, unless every other writing operating as a defeasance of it, or
> explanatory of its being intended to have the effect only of a mortgage, also is
> recorded in the same records at the same time.

*Id.*

37.     When the "special warranty deed" is read in connection with the deed of lease and the

purchase option agreement also executed between Ms. Chase and The Nastos Group, and when

the circumstances surrounding this transaction are taken into account, the "special warranty

deed" clearly appears to have been intended only as security for Ms. Chase's payment of

$230,000.00 to The Nastos Group.  The deed of lease and purchase option agreement were not,

however, recorded in the land records. Therefore, the "special warranty deed" evidences only a

mortgage on the Property, not an absolute grant of the Property.

38.     In addition, the circumstances surrounding this transaction, and the documents executed

in the transaction, clearly evidence a mortgage under the rules of equity, for the same reason they

-8-

evidence a mortgage under Md. Code Ann., Real Prop.§7-101(a).

39.     As The Nastos Group asserted that is had title to the Property and evicted Ms. Chase from the Property through landlord tenant proceedings, and as it has taken the profits from the sale of the Property and given none of these profits to Ms.Chase, The Nastos Group contests Ms. Chase's contention that the transaction constituted a mortgage under Md. Code Ann., Real Prop.§7-101(a).

40.     Thus, there exists an actual controversy of a justiciable issue between Ms. Chase and The Nastos Group within the jurisdiction of this Court involving the rights and liabilities of the parties.

WHEREFORE, Ms. Chase respectfully requests declaratory judgment that:

a.      The "special warranty deed" naming Ms. Chase as the grantor and The Nastos Group as the grantee constituted a mortgage and not an absolute grant; and,

b.      Such other and further relief as the nature of this case may require.

## COUNT TWO
## USURY

41.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

42.     The Maryland Interest and Usury Provisions ("I&U"), Md. Comm. L. §12-101, *et seq.*, apply to the transaction between Ms. Chase and The Nastos Group, which constituted a mortgage for the reasons set forth above. This transaction will be hereinafter referred to as "the Mortgage."

43.     In connection with the Mortgage, Ms. Chase is a "borrower" as defined by I&U §12-101(b), and The Nastos Group is a "lender" as defined by I&U §12-101(f).

44.     Ms. Chase did not sign any written agreement which set forth a stated rate of interest to be charged by The Nastos Group on the Mortgage.

45.     The Nastos Group charged interest on the Mortgage in excess of 6% per year, in violation of a usury provision of I&U, §12-102.

46.     Specifically, The Nastos Group loaned Ms. Chase $148,475.00, and required her to pay $230,000.00 after 24 months to purchase her home, in addition to $1,500.00 monthly payments totaling $37,064.58. The total amount Ms. Chase was required to pay to Defendants, therefore, in exchange for their two-year, $148,475.00 loan, was $267,064.58. The interest charged on the Mortgage was therefore $118,589.58, or approximately 40% per year, under the Mortgage agreement.

47.     However, the Nastos Group actually collected more interest than they would have been able to collect under the Mortgage. The Nastos Group recently sold the Property for $295,000.00, and did not return any money to Ms. Chase. As a result, the Nastos Group realized interest of $146,525.00 after 20 months on the Mortgage, which results in an effective interest rate far in excess of 40% per year.

48.     The Nastos Group never contacted Ms. Chase to tell her that the Mortgage was usurious, and never attempted to cure the usury of the Mortgage.

49.     The Nastos Group's violations of I&U were perpetrated knowingly and willfully.

        WHEREFORE, Ms. Chase respectfully requests relief against The Nastos Group for:

        A.      Three times the amount of interest and charges collected in excess of the interest and charges authorized by the I&U;

-10-

B.      Interest and Costs; and,

C.      Such other and further relief as the nature of this case may require.

## COUNT THREE
### VIOLATION OF THE CREDIT REPAIR ORGANIZATIONS ACT

50.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

51.     Virginia Homesavers, Inc. and Mr. Miller are credit repair organizations as defined under

the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §1679(a)(3), as they provided

services, advice and assistance to Ms. Chase in return for the payment of money and other

valuable consideration, and represented that they would provide services, advice and assistance

to Ms. Chase in return for the payment of money and other valuable consideration, for the

express and implied purposes of improving her credit history, credit record, and credit rating.

Virginia Homesavers and Mr. Miller told Ms. Chase that they could help fix her credit, could

help remove some of the liens from her home which were affecting her credit, and that they could

arrange a refinancing to fix her credit situation with the mortgagor foreclosing on the Property,

among other things.

52.     Ms. Chase is an individual as defined under 15 U.S.C. §1679a(1).

53.     Virginia Homesavers and Mr. Miller violated 15 U.S.C. §1679b(3) when making untrue

and misleading representations of their services including but not limited to representations that

they could help fix her credit, could help remove some of the liens from her home which were

affecting her credit, and that they could arrange a refinancing to fix her credit situation with the

mortgagor foreclosing on the Property.

54.     Virginia Homesavers and Mr. Miller violated 15 U.S.C. §1679b(b) by charging and receiving money from Ms. Chase for the performance of the services they agreed to perform, including clearing up and improving her credit, and saving her home, before those services were fully performed.  Virginia Homesavers and Mr. Miller charged and received more than $37,000.00.

55.     Virginia Homesavers and Mr. Miller violated 15 U.S.C. §1679c in its entirety by failing to provide Ms. Chase with any of the disclosures required under that section.

56.     Virginia Homesavers and Mr. Miller violated 15 U.S.C. §1679d by failing to provide a written contract for services which complied with that section.

57.     Virginia Homesavers and Mr. Miller violated 15 U.S.C. §1679e by failing to provide Ms. Chase with a cancellation form and other information required under that section, and by failing to provide Ms. Chase with a copy of the agreement in compliance with that section.

58.     The violations of the CROA described above and perpetrated by Virginia Homesavers and Mr. Miller were perpetrated intentionally, and with actual malice.

59.     Ms. Chase has suffered significant economic and non-economic damages as the result of the acts of Virginia Homesavers and Mr. Miller in violation of the CROA, including but not limited to the loss of her home, the loss of the equity in her home, the payment of money to Virginia Homesavers and Mr. Miller that was not owed and not legally collectible, the increased monthly payments she was forced to make on the "lease" arranged by Mr. Miller with The Nastos Group, extreme mental anguish and emotional distress.

        WHEREFORE, Ms. Chase respectfully requests relief against Mr. Miller and Virginia

-12-

Homesavers, jointly and severally, for,

A.    Compensatory damages in excess of $25,000.00 in an amount to be determined by a
      jury;

B.    Punitive damages in an amount to be determined by a jury;

C.    Interest, Costs and Attorney's fees;

D.    Such other and further relief as the nature of this case may require.

## COUNT FOUR
## FRAUD

60.   The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

61.   Ms. Chase was induced to enter into the Mortgage transaction as the result of the

Defendants' fraudulent representations, including, but not limited to, the following:

a.    The representations of Mr. Miller and Virginia Homesavers that they were helping
      her save her home, could help fix her credit, could help remove some of the liens
      from her home which were affecting her credit, could arrange a refinancing to fix
      her credit situation with the mortgagor foreclosing on the Property, and that they
      were owed more than $37,000.00 in fees in return;

b.    The representations of William H. Miller, Virginia Homesavers and The Nastos
      Group that the papers she signed at the settlement, transferring the Property to The
      Nastos Group were to help save her home;

c.    The representations of William H. Miller, Virginia Homesavers, Inc. and The
      Nastos Group that she needed to sign a lease of her own property in connection

-13-

with the purported refinancing, and that she was paying The Nastos Group more

than $5,000.00 for rent escrow.

62.     The Defendants' representations were false.

63.     The Defendants made the representations with the intent that Ms. Chase rely on them.

64.     Ms. Chase relied on the Defendants' representations, as demonstrated by the fact that she

entered into the transaction with Defendants to try to save her home, signed the documents they

told her to sign, paid all of the defendants tens of thousands of dollars at the settlement, and made

substantial monthly payments to The Nastos Group in an amount nearly twice as much as her

previous mortgage payments on an equitable mortgage the Defendants never thought she could

pay, and which was designed for her to default.

65.     The Defendants' actions were perpetrated with actual malice.

66.     Ms. Chase has suffered significant economic and non-economic damages as a result of

the Defendants' fraudulent acts, including but not limited to making higher monthly payments to

the Defendants than her previous mortgage payments, being hauled into state District Court

numerous times in connection with the sham lease the Defendants had her sign so they could

summarily evict her when she fell behind on the monthly payments they knew she could not

afford, the emotional and mental distress resulting from the loss of her home and the Defendants'

acts.

        WHEREFORE, Ms. Chase respectfully requests relief against all of the Defendants,

jointly and severally, for:

    A.     Compensatory damages in excess of $25,000.00 in an amount to be determined by a

-14-

jury;

B.      Punitive damages in an amount to be determined by a jury;

C.      Interest and Costs;

D.      Such other and further relief as the nature of this case may require.

## COUNT FIVE
## VIOLATION OF THE TRUTH IN LENDING ACT

67.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

68.     The Mortgage was a "credit sale" as defined by the Truth In Lending Act, 15 U.S.C.

§§1601 *et seq*. (hereinafter "TILA"), specifically §1602(g), as it requires as compensation for The

Nastos Groups' extension of credit "a sum substantially equivalent to or in excess of the

aggregate value of the property," and upon payment of such, Ms. Chase "for no other or a

nominal consideration has the option to become, the owner of the property upon full compliance

with [her] obligations under the contract." *See* TILA §1602(g).

69.     Ms. Chase is a consumer as defined by the TILA, §1602(h), and the Mortgage transaction

was a "consumer credit transaction" as defined by 15 U.S.C. §1602(h), because Ms. Chase, to

whom credit was extended by the Nastos Group, is a natural person and the subject of the

transaction, the Mortgage, was primarily for personal, family, and household purposes.

70.     The Mortgage constituted a "mortgage" under the TILA §1602(aa) because the points and

fees payable by Ms. Chase at or before the loan closing exceeded 8% of the total loan amount.

The principal amount of the loan extended to Ms. Chase by The Nastos Group was for less than

$150,000.00, and more than $37,000.00, well over 8% of the principal balance of the mortgage,

-15-

was payable at or before closing to Mr. Miller, the broker, in points and fees.

71.     The Nastos Group is a "creditor" as defined by the TILA, §1602(f) because it originated a

mortgage as defined under TILA §1602(aa) through Mr. Miller and Virginia Homesavers, who

acted as mortgage brokers for the Mortgage. In addition, The Nastos Group is a "creditor" as it

has, on information and belief, extended more than one credit extension covered by TILA

§1602(aa) within twelve months from Ms. Chase's transaction.

72.     The Nastos Group did not give Ms. Chase disclosures including, but not limited to, the

"amount financed", the "finance charge", the "annual percentage rate," the "total of payments,"

the "number, amount, and due dates" of payments in her transaction. All of these disclosures and

more disclosures not given by The Nastos Group are required by TILA §1638.

73.     In addition, The Nastos Group did not give Ms. Chase disclosures including statements in

the following form:

"You are not required to complete this agreement merely because you have received these

disclosures or have signed a loan application."

"If you obtain this loan, the lender will have a mortgage on your home.  You could lose your

home, and any money you have put into it, if you do not meet your obligations under the loan."

        These disclosures are required, however, under TILA § 1639.

74.     When The Nastos Group failed to give Ms. Chase the disclosures required by TILA

§§1638 and 1639, it violated TILA §1639(a).

75.     In addition, The Nastos Group violated TILA §1639(h) because it extended credit to Ms.

Chase without regard to her ability to pay.

-16-

76.     In addition, The Nastos Group violated TILA §1639(e) because the Mortgage requires a balloon payment on or before May 9, 2007, less than five years from the date of execution of the Mortgage.

77.     The Nastos Group's failure to comply with 15 U.S.C. §§1638 and 1639 as described above constituted a failure to deliver the material disclosures required by TILA.

78.     Ms. Chase has a right to rescind the Mortgage transaction under TILA for up to three years after the date of the transaction, under TILA §1635, as she has never received the required material disclosures and as the Mortgage violated several provisions of TILA §1639, if not the whole section. *See* TILA §1639(j). Ms. Chase exercised her right to rescind the Mortgage through a letter sent to The Nastos Group on January 4, 2007. The Nastos Group failed to rescind the transaction as required, constituting a violation of the TILA.

79.     In addition, Ms. Chase has suffered economic and non-economic damages as the result of The Nastos Group's conduct in this case, including but not limited to the loss of title to her home, loss of the equity in her home, mental anguish and emotional distress and grief arising from The Nastos Group's acts including but not limited to attempting and succeeding at summarily evicting her from her own home under landlord tenant proceedings.

        WHEREFORE, Plaintiff respectfully requests relief against The Nastos Group for:

A.      Rescission of the Mortgage;

B.      Statutory damages in the amount of $2,000.00;

C.      Actual damages in excess of $25,000.00 in an amount to be determined by a jury;

D.      Attorney's fees;

E.     Interest and costs;

F.     Such other and further relief as the nature of this case may require.

## COUNT SIX
## VIOLATION OF THE MARYLAND FINDER'S FEE ACT

80.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

81.     Mr. Miller and Virginia Homesavers acted as a mortgage broker in connection with the Mortgage, because for a fee and other valuable consideration, received directly and indirectly, they aided and assisted Ms. Chase, a borrower, in obtaining the Mortgage loan; and neither Mr. Miller or Virginia Homesavers is named as a lender in the agreement, note, deed of trust, or other evidence of the indebtedness.

82.     Mr. Miller and Virginia Homesavers took a "finder's fee," as that term is defined in Md. Comm. L. §12-801(c), from Ms. Chase in connection with the Mortgage.

83.     Mr. Miller and Virginia Homesavers violated the Finder's Fee Act when they charged Ms. Chase a finder's fee which was not pursuant to a written agreement between them and Ms. Chase separate and distinct from any other document, when he did not disclose the terms of the proposed agreement to Ms. Chase before they undertook to assist her in obtaining a loan or advance of money, when they did not specify the amount of the finder's fee, and when they did not provide to Ms. Chase a copy of any agreement, dated and signed by Mr. Miller or Virginai Homesavers and Ms. Chase, within 10 business days after the date her loan application was completed.

84.     Mr. Miller and Virginia Homesavers violated the Finder's Fee Act when they charged

-18-

Ms. Chase a finder's fee in excess of eight percent of the amount of the loan or advance they obtained for her.

WHEREFORE, Ms. Chase respectfully requests relief against Mr. Miller and Virginia Homesavers, jointly and severally, for:

A.   Three times the amount of the finder's fee collected by Mr. Miller and Virginia Homesavers;

B.   Interest, Costs and Attorney's fees;

C.   Such other and further relief as the nature of this case may require.

## COUNT SEVEN
## VIOLATION OF THE MARYLAND CREDIT SERVICES BUSINESSES ACT

85.   The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

86.   Mr. Miller and Virginia Homesavers, Inc. are "credit services businesses" as defined by Md. Comm. L. §14-1901, the Maryland Credit Services Businesses Act ("MCSBA") as Mr. Miller and Virginia Homesavers, Inc., represented that they could obtain an extension of credit for Ms. Chase to refinance the Property and save her home from foreclosure, represented that they could give her advice and assistance in connection with obtaining an extension of credit to refinance the Property and save her home from foreclosure, and represented that they could help her improve her credit record and rating.

87.   Mr. Miller and Virginia Homesavers, Inc. violated the MCSBA when they received money and other valuable consideration from Ms. Chase when they had not secured a license under Title 11, Subtitle 3 of the Financial Institutions Article; when they made and used false and

misleading representations in the offer or sale of their credit services including but not limited to representations that that they were helping her save her home, could help fix her credit, could help remove some of the liens from her home which were affecting her credit, could arrange a refinancing to fix her credit situation with the mortgagor foreclosing on the Property, and that they were owed more than $37,000.00 in fees in return; when they engaged, directly and indirectly, in a course of acts and practices which operated as a fraud or deception on Ms. Chase in connection with the offer or sale of the services of a credit services business by dispossessing her of her house and tens of thousands of dollars in illegal fees; when they charged and received money and other valuable consideration from Ms. Chase prior to full and complete performance of the services that they agreed to perform for and on behalf of Ms. Chase; and when they assisted Ms. Chase in obtaining an extension of credit at a rate of interest prohibited under Title 12 of this article.

88.     Mr. Miller and Virginia Homesavers violated the MCSBA when they failed to give Ms. Chase the information statement required under the MCSBA §§14-1904 and 14-1905, and when they failed to utilize the required form of contract and give the required notices, including the notice of her right to cancel the contract, under the MCSBA §14-1906.

89.     Mr. Miller's and Virginia Homesavers' acts in violation of the MCSBA were perpetrated willfully.

90.     Ms. Chase has suffered significant economic and non-economic damages as the result of the acts of Virginia Homesavers and Mr. Miller in violation of the MCSBA, including but not limited to the loss of her home, the loss of the equity in her home, the payment of money to

-20-

Virginia Homesavers and Mr. Miller that was not owed and not legally collectible, the increased monthly payments she was forced to make on the "lease" arranged by Mr. Miller with The Nastos Group, extreme mental anguish and emotional distress.

WHEREFORE, Ms. Chase respectfully requests relief against Mr. Miller and Virginia Homesavers, jointly and severally, for:

D.     Compensatory damages in excess of $25,000.00 in an amount to be determined by a jury;

E.     Punitive damages in an amount to be determined by a jury;

F.     Interest, Costs and Attorney's fees;

G.     Such other and further relief as the nature of this case may require.

## COUNT EIGHT
## VIOLATION OF THE MARYLAND LANDLORD TENANT LAW

91.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

92.     The Nastos Group, while acting as a landlord, imposed a security deposit on Ms. Chase, who was a tenant under a Lease agreement, in excess of two months rent, in violation of Md. Real Prop. §8-203(b)(1). The monthly rent in the lease agreement is $1,500.00 per month, and The Nastos Group took a security deposit of $5,797.13.

WHEREFORE, Ms. Chase respectfully requests relief against The Nastos Group for:

A.     Threefold the total amount of the excessive security deposit charged, pursuant to Md Real Prop. §8-203(b)(2);

b.     Attorneys fees pursuant to Md Real Prop. §8-203(b)(2); and,

-21-

c.      Such other and further relief as the nature of this case may require.

## COUNT NINE
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT

93.     The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

94.     The acts and representations of the Defendants described above deceived and tended to deceive the Plaintiff, a consumer. The Defendants' representations included, but are not limited to, the acts described above and the following:

   a.      The representations of Mr. Miller and The Nastos Group that they were helping her save her home;

   b.      The representations of Mr. Miller and The Nastos Group that the papers she signed at the settlement, transferring the Property to The Nastos Group were to help save her home;

   c.      The representations of Mr. Miller and The Nastos Group that she needed to sign a lease of her own property in connection with their foreclosure rescue scheme;

   d.      The Nastos Group's representation that it was proper to take a "security deposit" in excess of two months rent.

95.     The Defendants also violated the Consumer Protection Act by evicting her from her home under landlord tenant proceedings when the true nature of the relationship between Plaintiff and The Nastos Group was not that of a landlord and a tenant, but rather of a mortgagor and mortgagee.

96.     The Defendants also violated the Consumer Protection Act when they failed to give her

-22-

the disclosures required under the TILA, and violated the TILA, as described above.

97.     The Defendants also violated the Consumer Protection Act by charging the Plaintiff usurious interest, as discussed above.

98.     The Defendants also violated the Consumer Protection Act through other actions undertaken by them in the transaction described in this Complaint, including engaging in the acts constituting aiding and abetting and conspiracy, as alleged below.

99.     The acts of the Defendants have caused the Plaintiff significant economic and non-economic damages.  Those damages include but are not limited to the loss of her home, the loss of the equity in her home, the payment of money to Virginia Homesavers and Mr. Miller that was not owed and not legally collectible, the increased monthly payments she was forced to make on the "lease" arranged by Mr. Miller with The Nastos Group, extreme mental anguish and emotional distress.

WHEREFORE, the Plaintiff requests relief against all the Defendants, jointly and severally, for:

A.     Compensatory damages in excess of $25,000.00 in an amount to be determined by a jury;

B.     Interest and Costs;

C.     Attorney's Fees; and,

D.     Such other and further relief as the nature of this case may require.

## COUNT TEN
## CIVIL CONSPIRACY

-23-

100.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

101.    The Defendants all confederated by agreement and understanding to engage in the foreclosure rescue scheme described above.

102.    Numerous unlawful and/or tortious acts were done and perpetrated in furtherance of the conspiracy, as described above.

103.    Ms. Chase has suffered actual, legal economic and non-economic damages as the result of the Defendants' conspiracy and the unlawful and tortious acts perpetrated in furtherance of that conspiracy.  Ms. Chase's damages include, but are not limited to, the loss of her home, the loss of the equity in her home, the payment of money to Virginia Homesavers and Mr. Miller that was not owed and not legally collectible, the increased monthly payments she was forced to make on the "lease" arranged by Mr. Miller with The Nastos Group, extreme mental anguish and emotional distress.

104.    The Defendants' conspiracy and the acts perpetrated in furtherance of that conspiracy were perpetrated with actual malice.

WHEREFORE, Ms. Chase respectfully requests relief against all of the Defendants, jointly and severally, for:

A.    Compensatory damages in excess of $25,000.00 in an amount to be determined by a jury;

B.    Punitive damages in an amount to be determined by a jury;

C.    Interest, Costs and Attorney's fees;

D.    Such other and further relief as the nature of this case may require.

## COUNT ELEVEN
## AIDING AND ABETTING

105.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

106.    All of the Defendants directly engaged in unlawful and tortious conduct as described above.

107.    Defendant The Nastos Group provided substantial assistance, aid, and encouragement to the other Defendants, in connection with those Defendants' unlawful and tortious acts. The Nastos Group had actual knowledge of the wrongful conduct of the other Defendants and its role in furthering that conduct.

108.    Defendant William H. Miller provided substantial assistance, aid, and encouragement to the other Defendants, in connection with those Defendants' unlawful and tortious acts. William H. Miller had actual knowledge of the wrongful conduct of the other Defendants and his role in furthering that conduct

109.    Defendant Virginia Homesavers provided substantial assistance, aid, and encouragement to the other Defendants, in connection with those Defendants' unlawful and tortious acts. Virginia Homesavers had actual knowledge of the wrongful conduct of the other Defendants and its role in furthering that conduct.

110.    The acts of the Defendants in unlawfully and tortiously aiding and abetting the other Defendants in their unlawful and tortious activities were perpetrated with actual malice.

111.    The acts of the Defendants in unlawfully and tortiously aiding and abetting the other Defendants caused Ms. Chase actual and legal economic and non-economic damages. Those

-25-

damages include, but are not limited to, the loss of her home, the loss of the equity in her home,

the payment of money to Virginia Homesavers and Mr. Miller that was not owed and not legally

collectible, the increased monthly payments she was forced to make on the "lease" arranged by

Mr. Miller with The Nastos Group, extreme mental anguish and emotional distress.

WHEREFORE, Ms. Chase respectfully requests relief against all of the Defendants, jointly and

severally, for:

A.   Compensatory damages in excess of $25,000.00 in an amount to be determined by a
     jury;

B.   Punitive damages in an amount to be determined by a jury;

C.   Interest, Costs and Attorney's fees;

D.   Such other and further relief as the nature of this case may require.

Respectfully submitted,

PETER A. HOLLAND
BENJAMIN H. CARNEY
The Holland Law Firm, P.C.
1410 Forest Drive, Ste. 21
Annapolis, MD 21403
(410) 280-6133
ATTORNEYS FOR MS. CHASE

TRUE COPY,
TEST Robert P. Duckworth, Clerk
By_____ Deputy

-26-

## DEMAND FOR JURY TRIAL

Plaintiff, Ms. Chase, through her attorneys, demands a jury trial on all issues in this action.

PETER A. HOLLAND
BENJAMIN H. CARNEY
The Holland Law Firm, P.C.
1410 Forest Drive, Ste. 21
Annapolis, MD 21403
(410) 280-6133
ATTORNEYS FOR MS. CHASE